UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Criminal No. 1:23-cr-00284 (JDB)** |
| | : | |
| **ZACHARIAH BOULTON,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Zachariah Boulton to 90 days of incarceration, followed by one year of supervised release, 60 hours of community service, and consistent with the plea agreement in this case, $500 in restitution.

I. **Introduction**

Boulton, a 38-year-old truck driver, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.

Boulton pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1), Entering and Remaining in a Restricted Building or Grounds. As explained herein, a sentence of incarceration is appropriate in this case because Boulton: (1) ignored obvious warning signs that he should not enter the U.S. Capitol; (2) posted numerous TikTok videos after January 6 in which he advocated

1

for additional political violence and minimized the actions of the rioters; and (3) failed to appreciate the seriousness of his actions following his arrest. Specifically, Boulton gave an interview to a newspaper reporter in which he stated that this case would result in just "a slap on the wrist."

The Court must also consider that Boulton's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the U.S. Capitol building and disrupt the proceedings. Here, the facts and circumstances support a sentence of 90 days of incarceration, followed by one year of supervised release.

II.     **Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 20 (Statement of Offense) ¶¶ 1–7.

*Boulton's Role in the January 6, 2021 Attack on the Capitol*

Boulton drove alone to Washington, D.C. from Villa Rica, Georgia to attend the "Stop the Steal" rally held on January 6, 2021. In the days leading up to January 6, Boulton posted on TikTok, stating that he was *running solo and [was] looking for a group."* On December 27, 2023, Boulton posted *"Anyone want to roll me to Washington DC jan 5th to the 6th?"* An acquaintance answered, *"We taking guns or not?"* Boulton responded, *"Im always armed and ready."* Not able to find a group to travel with, Boulton drove alone for 12 hours until he reached Washington, D.C.



*Image 1: Boulton was cavalier in his allusions to violence as he planned his trip to D.C.*

In a selfie-style video he posted on January 5, 2021, Boulton announced that he was 20 miles outside of D.C. and wanted to meet up with other protesters. Boulton's TikTok videos show that he spent the evening of January 5 gathered with other protesters at Freedom Plaza in D.C.

On the morning of January 6, Boulton watched the former president's speech near the Ellipse, and then walked with the crowd in the direction of the Capitol building.



*Image 2: Boulton by the Peace Circle Monument as he approached the Capitol.*

3

Boulton joined other rioters in moving past police barriers to get closer to the Capitol building. As he approached the Capitol, Boulton could see that rioters had overtaken the scaffolding by the Inaugural Stage, and he could see chemical irritants in the air.



*Image 3: A haze from chemical irritants filled the air as Boulton stood near scaffolding close to the U.S. Capitol.*

Boulton ascended the Northwest Staircase and walked to the Upper West Terrace at approximately 2:31 p.m. He entered the first floor of the Capitol building at the Upper West Terrace Door at approximately 2:39 p.m., and then ascended a stairwell and headed in the direction of the Rotunda.



*Image 4: Boulton entered the Capitol at 2:39 p.m. through a door that was clearly not intended for public use.*

Boulton entered the Rotunda at 2:41 p.m., where he filmed his surroundings before quickly exiting and then re-entering it. After exiting the Rotunda a second time, Boulton walked down an interior hallway near the Old Senate Chamber. At 2:46 p.m., Boulton stood towards the back of a large crowd of rioters that had faced off with a line of police officers who blocked the rioters' passage through the hallway. During a prolonged standoff, rioters surrounding Boulton chanted repeatedly "Fuck McConnell." Boulton filmed the rioters with his cellphone, tacitly approving their actions. When a physical altercation ensued between rioters at the front of the crowd and the police, Boulton could be seen on open-source videos pushing and being pushed from behind. Police deployed mace to disburse the crowd, and Boulton was captured on open-source video coughing and closing his eyes.





*Images 5-6: Boulton stood in the middle of a mob that pushed up against a police line. [Sentencing Exh. 1 at 00:38 and 01:13]*

Boulton descended down the Supreme Court Chamber stairs at 2:50 p.m. and exited the Capitol through the Senate Wing Door at 2:54 p.m.

As he drove home in the evening on January 6, and in the days immediately following January 6, Boulton posted videos and comments on TikTok discussing the attack on the Capitol building. Boulton would later delete much of his content that he posted on TikTok, but in the videos that the government was able to obtain through a search warrant, Boulton minimized the violence and mayhem that he had observed inside the Capitol on January 6.

In one of the videos he filmed as he drove home, Boulton stated violence was needed to achieve his political goals:

*"You know, I'm tired. I'm tired of these limp-wristed conservatives that just want to show up and chant but don't want to do real patriotic shit. You know what? The tree of liberty from time to time needs to be watered with the blood of patriots and tyrants. Don't come at me, oh, you lowered yourself by going into that Capitol building. Fuck that. We need to send them a message now that they will understand and that's it. No property was really destroyed other than a window. But we made ourselves clear that we will not stand by and shit's gonna get real. If you're not ready for that, go hide."*

[Sentencing Exh. 2]

6

In a separate TikTok video that appeared to be filmed at the same time, Boulton minimized the vandalism and destruction wrought inside the Capitol building, stating:

*"I consider myself a patriot. I served in the army. I'm a disabled veteran. Hell, I was born on the Fourth of July. When I was in that Capitol Building today, I didn't see anybody vandalizing anything. I didn't see anybody stealing anything. In fact, I saw people standing guard saying hey, don't damage anything, our taxpayer money pays for this stuff and some of this stuff is not replaceable. But what I did see, is I did see a message being sent to our corrupt politicians that was clear as day. Get ready people, cuz we're coming."*

[Sentencing Exh. 3]

In a private social messaging group, Boulton acknowledged rioters had been violent, stating that rioters had *"stormed"* the Capitol building and engaged in *"clashes with the riot police."* He cavalierly alluded to a coming *"civil war."*



Image 7: Boulton's private messages acknowledged the violence on January 6.

In written comments on TikTok that extended well past January 6, Boulton continued to minimize the property damage and violence caused by the rioters, though in one post on January 15, 2021, he acknowledged the utter disrespect the rioters showed for the Capitol on January 6:

> Date: 01/15/2021 03:38AM (UTC +00)
> Comment: "I'll never forget seeing them shit in the sink..."

Echoing conspiracy theories, Boulton also used social media to cast blame for the events of January 6 away from the rioters and onto police:

Date: 07/08/2021 12:12AM (UTC +00)
Comment: "I was there when the cops opened the lock doors."

*Boulton's Interview with FBI Agents*

Although not required to do so, Boulton agreed to be interviewed by FBI agents after entering into a plea agreement. During the interview, Boulton stated that he drove 12 hours from Georgia to Washington, D.C. because he wanted to listen to the former President. He had no planned idea of what would occur on January 6, but wanted to "go with the flow" and see what would transpire. As he was approaching the Capitol building, he saw concrete barriers and understood that police were shooting dispersal objects into the crowd. He entered the Capitol building from the Upper West Terrace and followed police officers and 50 other rioters inside of the building. He exited the Capitol building after being sprayed with mace. Boulton stated that on January 6 he did not see rioters damage property, apart from one individual with a 2x4 piece of wood who tried break a window and was prevented from doing so by other rioters.

When asked about his TikTok videos that glorified violence, Boulton stated that he is a former military servicemember and does not wish to see violence, but people have obligations to respond to tyranny and corruption. He stated that the Founding Fathers hung tyrants, and if someone is a criminal and a tyrant, then that person should also be hung. He explained that while he would not personally take action to hang another individual, he hoped there would be an investigation into the "stolen election" that would result in punishment for wrongdoers. If those wrongdoers were convicted of treason, hanging would be the proper punishment. Boulton explained that he deleted his social media after January 6 because "people were going nuts" and he was being "verbally assaulted" online. He stated that he enjoyed the former president's speech, but in hindsight, he should have known better than enter the Capitol building.

8

Boulton stated that he accepts responsibility for his actions and wants to proceed with his life.

### III.     The Charges and Plea Agreement

On June 13, 2023, the United States charged Boulton by criminal complaint with violating 18 U.S.C. § 1752(a)(1), Entering and Remaining in a Restricted Building or Grounds; 18 U.S.C. § 1752(a)(2), Disorderly and Disruptive Conduct in a Restricted Building or Grounds; 40 U.S.C. § 5104(e)(2)(D), Disorderly Conduct in a Capitol Building or Grounds; and 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building.  On July 10, 2023, Boulton self-surrendered to law enforcement officials in Atlanta, Georgia.  ECF No. 5.  On August 21, 2023, the United States charged Boulton by Information with the above violations.  ECF No. 14.  On November 7, 2023, Boulton entered a plea of guilty to violating 18 U.S.C. § 1752 (a)(1).  ECF No. 19.  By plea agreement, Boulton agreed to pay $500 in restitution to the Architect of the Capitol.

### IV.     Statutory Penalties

Boulton now faces a sentencing on a single count of violating 18 U.S.C. § 1752(a)(1).  As noted by the plea agreement and the U.S. Probation Office, Boulton faces up to six months of imprisonment and a fine of up to $5,000.  He must also pay restitution under the terms of his plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  *United States v. Gall*, 552 U.S. 38, 49 (2007).  "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence.  *Id.*

at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 28-37.

*Application of U.S.S.G. § 4C1.1 for Boulton*

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 is now in effect but was not at the time the parties entered into the plea agreement, and so was not addressed in that agreement.

The Court should not apply § 4C1.1 here for the reason that the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional

10

proceedings and each individual rioters contributed to that disruption.  Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions").

Moreover, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010.  Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6.  This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court finds that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level.  Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[1]

---

[1] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the

11

The U.S. Probation Office calculated Boulton's criminal history as Category I. PSR at ¶ 42. Accordingly, the U.S. Probation Office calculated Boulton's total adjusted offense level, after acceptance, at 4, and his corresponding Guidelines imprisonment range at 0-6 months PSR at ¶ 89. Boulton's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

V.   **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 90 days of incarceration and $500 in restitution.

**A. The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy. *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States*

---

offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

12

*v. Judd*, 579 FSupp.1 at ___ *5 (D.D.C. 2021). While assessing Boulton's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Boulton, the absence of violent or destructive acts is not a mitigating factor. Had he engaged in such conduct, he would have faced additional criminal charges.

The most important factors in Boulton's case are his call for future violence against "corrupt politicians," his glorification of the attack on the U.S. Capitol, and his minimization of the harms that ensued on January 6. In TikTok videos, Boulton told listeners that *"we made ourselves clear that we will not stand by and shit's gonna get real. If you're not ready for that, go hide."* After joining a riotous mob that overwhelmed police both inside and outside the Capitol, Boulton later blamed police and others for what occurred, telling a reporter, *"I was literally there when they opened the doors to us. They waived us in."*

### B. The History and Characteristics of Boulton

Boulton served as a financial management technician for the U.S. Army. He received an Under Honorable discharge in March 2019 for extramarital conduct. In his TikTok postings celebrating the actions of the rioters on January 6, Boulton frequently mentioned his military background. As a formerly military service member, Boulton clearly knew that individuals do not have the right to enter restricted government buildings. He would have also known that participating in a violent attack on the U.S. Capitol to disrupt the peaceful transition of power was a betrayal of the oath that he took to defend the U.S. Constitution.

Boulton has two prior criminal convictions. In 2005, when he was 20 years old, Boulton was convicted of criminal mischief in Cordova, Alaska. According to information in the PSR, Boulton did not like that other campers had "taken over" his campsite, set fire to a tent and placed

rotting salmon in the area. Boulton was sentenced to 300 days imprisonment, with 210 days suspended, and was on probation until October 2009. PSR at ¶ 40. In 2006, Boulton was convicted in Carroll County, Georgia for carrying a concealed weapon without a permit. He received 12 months of probation and paid a fine. PSR at ¶ 41.

With respect to the above-captioned case, Boulton's supervising Probation Officer described him as "semi-compliant" with the conditions of his pretrial release. PSR ¶ 12.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be

14

deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

There is a strong need for specific deterrence in this case. Although Boulton has pleaded guilty and taken responsibility for his actions, he does not have actual remorse for his conduct on January 6. In TikTok videos, Boulton repeatedly glorified the actions of the January 6 rioters and tried to cast them in a patriotic light, while ignoring or minimizing the harms caused by the rioters and their threats to the peaceful transfer of power in the United States.

Even after his arrest, Boulton expressed no remorse for his actions. In an interview with a reporter for *The Atlanta Journal-Constitution* newspaper on August 1, 2023, Boulton told the reporter that he was not concerned about criminal charges in this case, stating "It's just going to be a slap on the wrist. I'm not too concerned about a misdemeanor. If it was a felony, I'd fight it to the hilt." Boulton told that same reporter that January 6 was caused by the federal government, who entrapped rioters by welcoming them into the U.S. Capitol building.

Additionally, Boulton's compliance with conditions of release was less than scrupulous according to Probation and provides yet another indicator that Boulton lacks respect for rules and authority.

Specific deterrence is strongly needed in this case. Since Boulton has no remorse and does not think his actions on January 6 were harmful, Boulton must be prevented from participating in future violent attacks in support of his political goals.



*Image 8: Boulton mocked this criminal proceeding in an interview with a major newspaper in Atlanta, GA.*

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

16

Court must sentence Boulton based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Boulton has pleaded guilty to the Information charging him with violating 18 U.S.C. § 1752(a)(1). The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Samuel Montoya*, 21-cr-336 (JDB), the defendant pled guilty to a misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) and was sentenced by this Court to 120 days of home detention and $500 in restitution. Whereas Montoya created a 44-minute video of his time at the Capitol to be published on InfoWars, Boulton created many videos about January 6 that he posted on TikTok. Video evidence from January 6 showed that both Boulton and Montoya witnessed acts of violence (in Montoya's case, the breaching of the police line in Crypt, and in Boulton's case, the physical scuffle between rioters and police by the Old Senate Chamber). Montoya did not demonstrate remorse, and later tried to capitalize on his participation in the riot in his unsuccessful political campaign for the House of Representatives. Boulton, by contrast,

gave an interview to a reporter of a major newspaper in Atlanta, Georgia, in which he mocked this legal proceeding because he would only get a "slap on the wrist."

In *United States v. James Horning*, 21-cr-275 (ABJ), the defendant pled guilty to violating 18 U.S.C. § 1752(a)(1), and was sentenced to 30 days of incarceration and one year of supervised release. On January 6, Both Horning and Boulton spent approximately 15 minutes inside the U.S. Capitol, and both were later active on social media to glorify the actions of the rioters and post threatening messages that encouraged violence against lawmakers. Similar to Boulton, Horning was not remorseful of his intrusion into the Capitol.

The Court may also consider the sentence imposed in *United States v. Jon Heneghan and Carol Kicinski*, 22-cr-61 (RBW), who both pleaded guilty to violating 18 U.S.C. § 1752(a)(1) and were both sentenced to 20 days of incarceration and one year of supervised release. Similar to Boulton, both Heneghan and Kicinski spent approximately 20 minutes inside the Capitol on January 6. Whereas Heneghan and Kicinski entered a sensitive area—the Speaker's Suite, Boulton walked widely across the Capitol building. Heneghan filmed violence against police officers while he was inside the Capitol; Boulton also filmed on his phone and later posted videos onto TikTok. Both Boulton and Kicinski celebrated the political violence and the actions of the rioters after January 6.

## VI.     Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

18

restitution under the VWPA).[3]  Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).  At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.  The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Boulton must pay $500 in restitution, which reflects in part the role Boulton played in the riot on January 6.[4]  Plea Agreement at ¶ 12.  As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.*  Boulton's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.  *See* PSR ¶ 12.

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VII. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Boulton to 90 days of incarceration, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: */s/ Melanie Krebs-Pilotti*
Melanie Krebs-Pilotti
Trial Attorney- Antitrust Division
Cal Bar. No. 241484
601 D St., NW
Washington, D.C. 20001
melanie.krebs-pilotti2@usdoj.gov
(202) 870-7457