IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL CASE NO. 1:23-CR-00284-JDB |
| ZACHARIAH BOULTON | |

**SENTENCING MEMORANDUM
ON BEHALF OF ZACHARIAH BOULTON**

On January 5, 2021, Mr. Boulton walked back and forth between his home and car. He was packing for a long road trip to the Nation's capital. He didn't plan to be away from home for too long; just a day or two. But he was excited to see President Trump's speech. He knew the President to be a dynamic speaker and figured that since Trump was leaving office, this would be the last opportunity to see him in action. Plus, Mr. Boulton had never seen a president speak in person. So, despite having found no one to attend the event with him, Mr. Boulton decided to go on his own. He grabbed some clothes and secured some water and snacks for the drive. When he was finished packing, he said goodbye to his wife (at the time) and gave his dog a heartfelt farewell. He got into his car alone and began the long, overnight journey from Villa Rica, Georgia to the Nation's capital.

On January 6, 2021, Mr. Boulton was in Washington D.C. for one reason

and one reason only: to see President Trump's final remarks. However, during the events of January 6, Mr. Boulton was swept up in the crowd and regrettably committed the offense of conviction. But since that time, he has repeatedly stated that he would not make the same choices today and has accepted responsibility for his actions.

Mr. Boulton respectfully asks this Court to impose a sentence of 18 months of probation, along with 50 hours of community service. This sentence is both within the guideline range and is presumed appropriate given Mr. Boulton's status as a zero-point offender. *See* U.S.S.G. § 5C1.1, Application Note 10(A). Through this memorandum, counsel will show that a within-guideline, probationary sentence, paired with 50 hours of community service, would satisfy the sentencing goals set forth in 18 U.S.C. § 3553(a).

## FACTS

During the afternoon of January 6, 2021, Mr. Boulton, along with a large crowd, entered the United States Capitol building without permission. Mr. Boulton entered the first floor of the Capitol through the Upper West Terrace Door and remained in the Capitol for approximately 15 minutes. While in the Capitol, he moved with the crowd and recorded several videos that he later uploaded to the internet. *Id.*

Mr. Boulton ultimately pled guilty to 18 U.S.C. § 1752(a)(1), "Entering and Remaining in a Restricted Building or Grounds." In so doing, Mr. Boulton

quickly accepted responsibility for his actions and has not taken any action contrary to that acceptance since.

## LEGAL ARGUMENT

**1. Mr. Boulton is a zero-point offender and is entitled to a 2-level reduction pursuant to U.S.S.G. § 4C1.1.**

Under U.S.S.G. § 4C1.1, Mr. Boulton's offense level must be decreased by 2 levels. The 2023 Sentencing Guidelines include a new adjustment for certain zero-point offenders. The text of § 4C1.1 clearly states that any defendant that meets all the criteria should receive the 2-level adjustment.

Mr. Boulton is one such defendant. He did not receive any criminal history points or an adjustment under § 3A1.4. He did not use either violence or credible threats of violence in connection with the offense of conviction. Despite his distasteful social media posts, Mr. Boulton's comments demonstrate extravagant bravado and herd mentality, not a plausible threat of violence from someone who'd already departed the Capitol. Likewise, Mr. Boulton's offense did not result in either death or serious bodily injury nor is his crime a sex offense. He did not personally cause substantial financial hardship and his offense did not involve a firearm. The instant offense is not covered by § 2H1.1 and he did not receive adjustments under §§ 3A1.1, 3A1.5, or 3B1.1. Finally, Mr. Boulton was not engaged in a continuing criminal enterprise.

The fact that Mr. Boulton's offense happened alongside several other defendants is immaterial. The criteria set forth in § 4C1.1 are individualized; they pertain to the specific defendant. It is possible that other January 6 defendants, because of their personal actions, might not meet some of the criteria set forth in § 4C1.1 and would not be entitled to the downward adjustment. But that fact does not change Mr. Boulton's eligibility. And as this Court recently noted, a January 6 defendant, like any other defendant that meets the § 4C1.1 criteria, is entitled to the two-level reduction. *See United States of America v. Sheppard*, No. CR 21-203 (JDB), 2024 WL 127016 (D.D.C. Jan. 11, 2024).

The government argues that the § 4C1.1 adjustment should not apply, in part, because the Sentencing Commission looked at recidivism data that predated January 6, 2021. (*See* Doc. 26 at 11). But this argument is unavailing. The events of January 6, 2021, took place *almost three years* before the 2023 Guidelines became effective on November 1, 2023. The Sentencing Commission had ample time to add a criterion that would categorically exclude January 6 defendants. But it chose not to. This Court should not, and cannot, overrule the Sentencing Commission's decision. *See Gall v. United States*, 552 U.S. 38, 49 (2007) (noting that sentencing courts must correctly calculate the applicable range according to the Guidelines).

For the foregoing reasons, Mr. Boulton is entitled to the 2-level reduction

and his offense level should be decreased to a total offense level of 2.

## 2. A within-guideline, probationary sentence is appropriate in light of the sentencing factors set forth in 18 U.S.C. § 3553(a).

The sentencing factors set forth in 18 U.S.C. § 3553(a) counsel in favor of a within-guideline, probationary sentence. As the Court is aware, it must consider the § 3553(a) factors and impose a sentence that is "sufficient, but not greater than necessary," to comply with the statutory purposes. 18 U.S.C. § 3553(a). For the reasons set forth below, these statutory factors indicate that a probationary sentence is appropriate.

> *a. Both Mr. Boulton's history and characteristics and the nature and circumstances of his offense counsel in favor of probation.*

Mr. Boulton's history and characteristics counsel in favor of a probationary sentence. Born at a military base on July 4, 1985, Mr. Boulton's future as an Army man was written in the stars long ago. And of all his identities, his status as a United States veteran is perhaps the most important one. As his father, Kevin Boulton, wrote in his letter to the Court, "[h]e was always raised under the patriotic banner of our country by sharing his day of birth with that of our country." (Attachment C at 1).

Mr. Boulton joined the Army National Guard in March of 2013. PSR at ¶ 52. During his time in the National Guard, Mr. Boulton spent time at several domestic bases and even an Army garrison in South Korea. *Id.* He worked as a 36 Bravo Financial Management Technician and handled complex financial

matters for the United States military. Through audits of military offices, he found places where the government was erroneously losing money and worked to ensure that those mistakes were rectified. He received numerous awards for his service, including ribbons, good conduct medals, and other decorations. PSR at ¶ 81. Mr. Boulton, and his family, are extremely proud of his military service. When he completed his contract and was discharged from the military, he had achieved the rank of Specialist.[1] *Id.*





*Select Photos: Highlights of Mr. Boulton's Military Career*

---

[1] Mr. Boulton's "Under Honorable" Discharge was the result of having received an Article 15 punishment for engaging in extramarital sexual conduct, a violation of military code.

Since his discharge in 2019, Mr. Boulton has focused much of his time on staying gainfully employed and giving back to the community. He attended Kennesaw State University from 2019 to 2021 until it became too expensive. PSR at ¶ 69. Mr. Boulton has had several jobs, including working for his father's company, Georgia Highspeed Country Internet, a company dedicated to ameliorating the digital gap in rural communities. He has also worked as both a forklift operator and a truck driver. PSR at ¶¶ 72-77.

As a truck driver, Mr. Boulton is usually gone for two to three weeks at a time. But during the time that he is in Georgia, he makes a concerted effort to help others in his community. He helps with his parents' ministry, Covenant Keepers Ministry, and assists community members, like the elderly or single mothers, with yard work, car repairs, and other tasks. (See Attachment B). Mr. Boulton is a dedicated member of both his family and community. His military service and community work do not excuse the actions that form the basis of this prosecution. But they do show that this criminal offense was an aberration in what has been an overwhelmingly law-abiding life.

The nature and circumstances of this offense also support a probationary sentence. Mr. Boulton's criminal conduct was serious. Along with a crowd of other individuals, he walked up the exterior stairs of the U.S. Capitol and entered the building without permission. He recorded videos, was part of the crowd that advanced further into the building, and stayed in the building for

7

15 minutes. These actions were both illegal and consequential.

But it is also important to acknowledge what Mr. Boulton *did not* do on January 6, 2021. He was not one of the people that pushed through the barriers outside the Capitol. He did not assault any U.S. Capitol police officers or other security personnel. He did not cause any property damage to the Capitol building or enter any Congressional offices. And although the government suggests that Mr. Boulton's "armed and ready" comment was an allusion to violence, (*see* Doc. 26 at 2-3), this is belied by all the evidence in this case. Mr. Boulton did not have a weapon on his person when he went to the Capitol. The government has not provided evidence to the contrary because no such evidence exists.

The PSR discusses a quote from one of Mr. Boulton's TikTok videos after January 6. In that video, a recording from over three years ago, Mr. Boulton repeated Thomas Jefferson's famous "tree of liberty" quote and described his thoughts at the time. PSR at ¶ 23. Although the words that he used sounded threatening on their face, Mr. Boulton did not attack Capitol officers during the events of January 6 and has not engaged in violence in the three years since. Considering the nature and circumstances of his criminal offense, a probationary sentence, paired with community service, would be an appropriate punishment.

> *b. A sentence of probation, and the many collateral consequences that would accompany it, are sufficient to accomplish the statutory purposes of punishment.*

A probationary sentence is sufficient, but not greater than necessary, to accomplish the purposes of punishment set forth in 18 U.S.C. § 3553(a)(2). First, a probationary sentence would reflect the seriousness of the offense and promote respect for the law. Mr. Boulton understands that the instant offense is serious. He turned himself in as soon as he learned of the warrant for his arrest. He has reiterated again and again that he should not have entered the Capitol and would make different choices today. During his interview with FBI Special Agents King and Kelly, an interview that he volunteered to participate in, he acknowledged that he should have known better and stated that he would never do it again. And he even attempted to pay his $500 restitution and special assessment fee in advance of sentencing, but was advised that he could not pay the fees/fines until they were imposed.  All these facts show that Mr. Boulton has respect for the law and understands the seriousness of his conduct.

Additionally, a probationary sentence would provide just punishment for the offense. Mr. Boulton will forever have a federal criminal conviction on his record. And this conviction comes with several consequences that will significantly impact his life. In 2019, the United States Commission on Civil Rights authored a report on collateral consequences that was ultimately sent to the White House. The Commission found that collateral consequences "can

create an array of lifelong barriers," that include, but are not limited to, "barriers to voting and other civic participation, education, employment, professional licensing, housing, and receipt of public benefits."[2] Mr. Boulton will face these barriers for the rest of his life.

Mr. Boulton will also be subject to many conditions of probation. This Court is aware of the many conditions that accompany a probationary sentence, including prohibitions on possessing firearms, restrictions on one's freedom of movement, loss of privacy in one's own home and finances, and more. And although these conditions can be burdensome, Mr. Boulton has proven that he will be successful on probation. He has been compliant on probation, with the only hiccups being occasionally forgetting to send his trucking routes and check in telephonically while on days-long trucking jobs. Despite these occasional mistakes, his supervising officer has noted that he "has otherwise reported as directed and remains responsive." PSR at ¶ 12. Mr. Boulton will take probation seriously and will continue to be compliant and responsive.

Importantly, a probationary sentence will afford adequate general and specific deterrence. Contrary to the government's argument, (*see* Doc. 26 at 14), general deterrence is not a "compelling reason" to impose a sentence of

---

[2] U.S. COMM'N ON CIV. RTS., COLLATERAL CONSEQUENCES: THE CROSSROADS OF PUNISHMENT, REDEMPTION, AND THE EFFECTS ON COMMUNITIES 9 (2019). 06-13-Collateral-Consequences.pdf (usccr.gov)

incarceration. The National Institute of Justice, which is the research, development, and evaluation division of the United States Department of Justice, published a document called "Five Things About Deterrence." The document summarizes research related to the deterrence of crime. According to the Institute's summary, "the *certainty* of being caught is a vastly more powerful deterrent than the punishment."[3] And the instant arrest and prosecution, along with the prosecutions of *hundreds* of others, has already proven that should Mr. Boulton, or anyone else, commit crimes like this in the future, they can be *certain* that they will be caught, federally prosecuted, and potentially subject to incarceration. This certainty of capture is sufficient specific and general deterrence. Even more, the same "Five Things About Deterrence" article also declares that "[l]aws and policies designed to deter crime by focusing mainly on increasing the severity of punishment are ineffective partly because criminals know little about the sanctions for specific crimes."[4] The government's argument for incarceration on the basis of general deterrence flies in the face of the DOJ's own research.

Similarly, a probationary sentence will accomplish specific deterrence and ensure that Mr. Boulton does not commit any additional crimes. As discussed above, Mr. Boulton has reiterated time and time again that he

---

[3] NAT'L INST. OF JUST., FIVE THINGS ABOUT DETERRENCE 1 (2016). HTTPS://WWW.OJP.GOV/PDFFILES1/NIJ/247350.PDF
[4] *Id.*

11

should not have entered the Capitol. If he could go back and stop himself from joining the crowd, he would. Even so, a probationary sentence will ensure that he will not, and cannot, commit any crimes. Refraining from any future crime will be a mandatory condition of his probation. 18 U.S.C. § 3563(a)(1). He will also have to submit to the collection of a DNA sample, further deterring any potential criminal conduct. 18 U.S.C. § 3563(a)(9). Notably, he will have to continue checking in with a probation officer and submitting to that officer's rules. All these safeguards will further guarantee that Mr. Boulton is deterred from any criminal conduct and assure the safety of the public.

The government calls attention to Mr. Boulton's interview in *The Atlanta Journal-Constitution* from July of 2023. Mr. Boulton gave that interview at an emotionally volatile time, shortly after his arrest. He made regrettable statements during that interview. But it is important to note that the interview took place over six months ago. Mr. Boulton's perspective on this prosecution has changed dramatically. When asked about the newspaper article during his FBI interview, an interview that took place less than a month ago, Mr. Boulton stated that he was agitated when he made those statements. Even more importantly, he stated unequivocally that he knows what he did was wrong, he has accepted responsibility for his actions, and will accept whatever punishment he is given. Mr. Boulton will not re-offend.

> *c. A within-guideline, probationary sentence is necessary to avoid unwarranted sentence disparities among similarly situated defendants.*

A probationary sentence is necessary to avoid unwarranted sentence disparities. As explained previously, Mr. Boulton is entitled to the Zero-Point Adjustment in § 4C1.1 and should have an offense level of 2. But even similarly situated defendants with offense levels of 4 receive probationary sentences more often than not. According to JSIN, during fiscal years 2018-2022, *60% of similarly situated defendants received probation*. *See* PSR at ¶ 119 (stating that only 40% of similarly situated U.S.S.G. § 2B2.3 defendants receive a sentence of imprisonment). Any sentence of incarceration would create an unwarranted sentence disparity.

Notably, the JSIN tool is only limited to fiscal years 2018-2022. The Sentencing Commission's 2023 Guidelines Manual now includes the § 4C1.1 Adjustment for Certain Zero-Point Offenders. So, it is entirely possible, even probable, that some of the defendants whose sentences are reflected in JSIN would be even lower under the current Guidelines.

Moreover, in similarly situated January 6 cases, many defendants have received probationary sentences. Even defendants who engaged in worse conduct than Mr. Boulton have received probationary sentences. The following chart demonstrates this point:

13

| CASE | DETAILS | SENTENCE |
|---|---|---|
| Conlin Weyer 1:22-cr-00169-JMC | GL: 0-6<br><br>Climbed the scaffolding and entered the Capitol. Recorded videos while on Capitol grounds. Spent 35 minutes in the Capitol. No destruction of property. | 18 months probation |
| Rachael Pert 1:21-CR-00139-TNM | GL: 0-6<br><br>Brought a flag to the Capitol to "hit Antifa in the head if need be." Spent over half an hour in the Capitol building. | 24 months probation 100 hours community service |
| Jordan Bonenberger 1:22-CR-00102-JDB | GL: N/A<br><br>Entered the Capitol through the Upper West Terrace doors about five minutes after the breach. Spent 20 minutes in the Capitol and took pictures on Capitol grounds. | 18 months probation 50 hours community service |
| James Brooks 1:22-CR-00018-JMC | GL: 0-6<br><br>Brought tear gas, camouflage body armor and a two-way radio to D.C. Climbed railings to get to the Capitol. Remained in the Capitol for at least 2.5 hours. | 12 months probation 60 hours community service |

Like Conlin Weyer and Jordan Bonenberger, Mr. Boulton did not go to D.C. with violent intent and remained in the Capitol for a short period of time. And unlike Rachael Pert and James Brooks, he did not aspire to engage in violence. Still, every one of these defendants received probation for their actions on January 6, 2021. Sentencing Mr. Boulton to prison would create an unwarranted disparity between him and similarly situated defendants and punish him more than defendants who engaged in similar or worse conduct. Only a probationary sentence can avoid such a disparity.

The government points to three defendants that were sentenced for their involvement in the events of January 6 and argues that they are suitable comparisons. But those cases are fundamentally different from Mr. Boulton's case. For example, the defendant in *United States v. Samuel Montoya*, 21-cr-336 (JDB) was one of the first people to enter the Capitol building. He entered at 2:18pm, 21 minutes before Mr. Boulton and other individuals entered. When inside, he walked far into the Capitol and even entered Nancy Pelosi's suite. Samuel Montoya filmed the entire event, including the shooting of Ashli Babbitt, and later attempted to turn his actions into a political campaign. In contrast, Mr. Boulton entered the Capitol in a later crowd and did not walk far into the Capitol. And although Mr. Boulton did give a regrettable interview to *The Atlanta Journal Constitution* in July of 2023, unlike Samuel Montoya, he has repeatedly reiterated his regret over the course of this prosecution.

*United States v. James Horning*, 21-cr-275 (ABJ) is not like Mr. Boulton's case either. James Horning wrote on social media that his purpose in traveling to Washington D.C. was to intimidate Congress. He also smoked marijuana inside of the Capitol and bragged about doing so. In contrast, Mr. Boulton went to the Capitol with the sole purpose of seeing President Trump speak and did not engage in any action remotely similar to using drugs inside the Capitol.

Finally, the cases of *United States v. Jon Heneghan and Carol Kicinski*, 22-cr-61 (RBW) are dissimilar to this case. The two co-defendants entered the

15

Capitol around 2:23pm, only 12 minutes after the initial crowd entered. Importantly, the two individuals fought their way into a sensitive area: the Speaker's Office and Speaker's Suite. Mr. Boulton, on the other hand, did not enter the Capitol building until 2:41pm. He also refrained from entering sensitive areas like the Speaker's Office and Suite.

Mr. Boulton engaged in criminal conduct that he acknowledges was wrong. But his conduct was not like the other, more culpable defendants to which the government points. Instead, as discussed previously, his actions fall squarely in line with the cases that have received probationary sentences. A sentence of probation is necessary in this case to avoid unwarranted sentence disparities.

### d. *The Sentencing Guidelines indicate that, of all the sentences available, a probationary sentence is appropriate.*

The Sentencing Guidelines indicate that a probationary sentence is the appropriate punishment for Mr. Boulton. The United States Sentencing Commission is charged with, among other things, establishing sentencing policies that meet the purposes of sentencing. 28 U.S.C. § 991(b). And according to 28 U.S.C. § 994(j), part of that responsibility is making sure that "the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious

offense."

Pursuant to that responsibility, the Sentencing Commission promulgated both U.S.S.G. §§ 4C1.1 and 5C1.1 and their Application Notes. Section 5C1.1 of the Sentencing Guidelines states that when a defendant's applicable guideline range is in Zone A, a term of imprisonment is not required unless otherwise specified. And Application Note 10(A) of § 5C1.1 says that if a defendant receives an adjustment under § 4C1.1, the Adjustment for Certain Zero-Point Offenders, and their range is in Zone A, then a sentence other than imprisonment is generally appropriate.

Mr. Boulton meets both requirements. There is no dispute that Mr. Boulton's guideline range is in Zone A of the U.S.S.G. Sentencing Table. And as discussed above, Mr. Boulton meets all the criteria in U.S.S.G. § 4C1.1 and is entitled to the Adjustment for Certain Zero-Point Offenders. The Sentencing Commission has clearly determined that a sentence other than imprisonment is presumed to be appropriate in this case. Mr. Boulton should receive the benefit of their expertise.

## **CONCLUSION**

Zachariah Boulton did not go to Washington D.C. on January 6, 2021 with the intention of entering the Capitol building. He did not bring weapons, body armor, zip ties, or anything else that would indicate violent intent when he traveled to Washington D.C. The only reason he drove to the Nation's capital was to see President Trump speak for what he believed would be the last time.

Mr. Boulton engaged in regrettable conduct and wishes he had not participated in the criminal events of January 6. He has accepted responsibility for those actions. And he will be punished every day for the rest of his life by this federal conviction.

For the reasons set forth herein, Mr. Boulton respectfully requests a probationary sentence.

Dated: This 1st day of February, 2024.

Respectfully submitted.

*/s/ Ashley R. Martin*_____
ASHLEY R. MARTIN
GEORGIA BAR NO. 435062

*/s/ Jaster W. Francis Jr.*_____
JASTER W. FRANCIS JR.
GEORGIA BAR NO. 994359

ATTORNEYS FOR MR. BOULTON

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing filing has been formatted in Century Schoolbook 13 pt. and was electronically filed this day with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all counsel of record.

Dated: This 1st day of February, 2024.

                                                */s/ Ashley R. Martin*_____
ASHLEY R. MARTIN
GEORGIA BAR NO. 435062

*/s/ Jaster W. Francis Jr.*_____
JASTER W. FRANCIS JR.
GEORGIA BAR NO. 994359

ATTORNEYS FOR MR. BOULTON


Federal Defender Program, Inc.
Centennial Tower, Suite 1500
101 Marietta Street, N.W.
Atlanta, Georgia 30303
(404) 688-7530
Fax: (404) 688-0768
Ashley_Martin@fd.org
Jaster_Francis@fd.org